REPORTER.

---

Commissioners of the Sinking Fund *vs.* Theobald.   Case 2.

APPEAL FROM FRANKLIN CIRCUIT.                     Pet. Eq

1. As a corporation the commissioners of the sinking fund have only a limited power and prescribed duties imposed on them by the legis-

lature. The money placed under its control is the money of the commonwealth. It is the mere instrument or agent of the government, to take charge of certain specified revenues of the state, and disburse them, as provided by law, in discharge of the public debt.

2. The commissioners of the sinking fund may be sued when a proper case is made out.

3. By law the profits of the penitentiary go into the treasury of the state, to the credit of the sinking fund, to be appropriated to the extinguishment of the state debt; and the commissioners of the sinking fund can dispose of it in no other way, and to no other purpose; and the presumption is that the fund was annually so disbursed; and upon that presumption there was no part of the fund claimed in the hands of the commissioners in 1854, when this suit was instituted, and there was no foundation for any decree against them.

4. An agent receiving a fund, and paying it over to his principle, is not liable to the person who may seek to reclaim it; the resort must be to the principal.

[The facts of the case are given in the opinion of the court.—Rep.]

*Morehead & Brown,* and *Thos. A. Marshall* for appellant—

T. S. Theobald, a former keeper of the penitentiary, brought this suit against "the commissioners of the sinking fund," to recover from them $1,635 89, which sum he alledges he overpaid them beyond what they were entitled to receive under the legislative act of February, 1839, which gave them, during the plaintiff's last term of office, to-wit, from 1839 to 1844, one-half of the net profits of the penitentiary, to be annually settled with and paid to them, the keeper himself being entitled to retain, for his own compensation, the other half of the profits. The plaintiff states that he did make annual settlements with the commissioners, as required by the act, and did pay over to them, annually, what they were entitled to receive. And the foundation of his claim against them is understood to be in substance this, that at the expiration of his official term, in March, 1844, when, according to the terms of the act under which he was appointed, the property and as-

sets belonging to the penitentiary, after payment of its debts, and returning to the state the capital of $25,000, which had been loaned or advanced to the keeper, were to be equally divided between the commonwealth and him; that a valuation and disposition of said property and assets were accordingly made, under the special authority of an act of March, 1843, and according to the results of this valuation, and of the comparison authorized by the act of 1839, under which Theobald received the office, and directed by the act of March, 1843, between the value of certain property on hand when the term of office commenced, and of the same or like species on hand at its expiration, the keeper was to be credited or charged with the difference, as there might be an excess or deficit at the end of the term. And because, on a statement of the accounts based on this valuation, and including, of course, the annual payments to the commissioners, the commonwealth appeared to have received $1,635 89 more than she was entitled to, and the keeper that much less than his share, the attempt is made to coerce that sum from the commissioners of the sinking fund, with whom the keeper had made annual settlements, and to whom he had made annual payments founded on those settlements, which were themselves based upon accounts kept in the books of the penitentiary, and under the direction, or at least under the inspection, of the keeper, who must therefore be presumed to have understood them when he made his annual settlements and payments. If he supposed that the amounts to be received by the commissioners of the sinking fund, upon these annual settlements and payments, were to be affected by the condition in which the property and assets of the penitentiary might actually be, or might be estimated to be, at the end of the term, it was his duty and his interest to have due allowance made in the settlements for all probable contingencies. But this claim is clearly an afterthought.

By the act under which Theobald was elected keeper in 1839, he was to conduct the penitentiary, have possession of its property, control its operations, and manage its affairs, for the joint benefit of the commonwealth and himself, for the term of five years. They were, in effect, partners in the profits; and one of the terms of the partnership was that Theobald, the active partner, should annually settle with the commsssioners of the sinking fund, and pay to them the profits to which the commonwealth should be entitled.

Let it be supposed that the commissioners of the sinking fund were a private corporation, having and pursuing distinct interests of its own or of its members, and that this act, containing the terms of the joint interest or partnership in the profits of the penitentiary, of which the commonwealth was to have one-half and the keeper the other, had, as a means of paying a debt of the commonwealth to this corporation, or for some other sufficient and proper consideration or motive, inserted a mutual stipulation by the partners that the keeper of the penitentiary, as one of them, should, on a fixed day in each year, settle with this corporation, and pay to it the commonwealth's share, or one-half of the profits, would not this necessarily mean the current and apparent profits? Could it refer to anything unknown, and which not appearing nor being forseen could not be included in the settlement? Suppose then that after the keeper, in pursuance of his contract, had year after year regularly settled or reported a balance of profits, and paid to this corporation one-half as the share of the commonwealth, charging her of course with these payments, for which she would in turn be credited by the corporation which received them, it should, upon the final close and settlement of the partnership, in accordance with all of its terms providing for that event, appear that the profits had been less than was supposed, or that there had been a loss, or that by reason of increased ad-

vances on the part of the keeper, the share of the commonwealth was less than she had received through the corporation to which payments were made on account of her share, is it in point of reason and law conceivable that the corporation referred to would or could be involved in any of the consequences of such a result? Whether, as between the partners, the apparent result was just or unjust, whether it was accordant with the real state of things, or was brought about by excessive valuations, entitling the keeper to excessive credits, it would be a matter exclusively between the keeper on the one side and the commonwealth on the other. And even if the keeper, by mistake, had over-estimated the profits, and thus overpaid the share of the commonwealth, his right of reclamation would be against the commonwealth alone, unless the third party, who received the benefit, had by fraud or other fault been instrumental in producing the mistake, or was at least shown to have been cognizant of it; or if, because the third party participated in the settlements on which the payments were made, he might possibly be held liable to make good the mistake, which is not admitted, it seems, at least to be requisite that the mistake should be shown to have been committed in the very settlements to which he was a party. But here there is not even an allegation of such mistake; nor is there any such particularity of statement or proof, as is universally required, to authorize the opening of a settlement, and the readjustment of the matters involved upon their original merits. But the allegation is that the plaintiff paid to the defendant $1,635 89 more than, under the provisions of the act, should have been paid, and that the defendant owes him that sum with interest. The proof relied on is a decree of the general court, based upon and virtually confirming the commissioners' report, which shewed that balance against the commonwealth, in a suit for a settlement, &c., brought in the name of the commonwealth against

COM'RS SINKING
FUND
vs.
THEOBALD.

Theobald; which report was itself based upon the valuation before referred to as being provided for by the act of 1843. This is manifested by the opinion of this court affirming said decree, and which is also referred to in the petition. (See *Commonwealth vs. Theobald*, 11th *B. Monroe*, 223.) That opinion shows explicitly that the report was based upon the valuation, and that the affirmance or reversal of the decree was understood to depend not simply upon the correctness of the valuation, but upon its validity and obligation upon the parties. And the court conceding that the valuation may have been too high, and that the valuers may have adopted an improper criterion for making it, determined, on the ground of extrinsic facts, that it should be deemed valid and obligatory, and affirmed the decree, without any further intimation as to the merits of the case, or the justice of the valuation. Nor did the decree itself decide that the report was correct as to the precise balance stated against the commonwealth, but reciting that the report showed that balance, and that no exception had been taken, it decided that the commonwealth had shown no ground of complaint against Theobald, and therefore dismissed her bill, without decreeing anything to Theobald. The commissioners of the sinking fund were not parties. to the decree nor to the affirmance, as they might have been, and as they no doubt would have been, if they had .been supposed to have been liable. As an independent private corporation they would not be bound by the decree or the affirmance, nor by any recitals contained in either.

But conceding that in view of their duties and agency, as prescribed by the act of March, 1843, and under the presumption that they acted accordingly, it may be assumed that they appointed the valuers, received their report, and acted on it in handing over the property of the penitentiary, as recited in the opinion of affirmance, and that their acts and acquiescence concluded them as to the va-

lidity of the valuation, all this, with even the further concession that they are concluded as to the correctness of the balance of $1,635 89 against the commonwealth, on a fair and final settlement of the accounts between her and Theobald as keeper of the penitentiary, still it is not shown how this final result is to effect the propriety of the intermediate settlements and payments ; nor is it shown how, by making the state his debtor on final settlement, the keeper of the penitentiary could acquire the right of reclaiming from the commissioners of the sinking fund, as an independent corporation, payments which he had voluntarily, and upon his own settlements, made to them under the authority of law, and in the name of the commonwealth's share of the profits. Suppose A, the dormant partner of B, gives an order in favor of C, founded on sufficient consideration, directing B to adjust with C A's portion of the profits up to a certain period, and to pay them over to C, has B a right, on afterwards finding that A's portion was not so great at the time as he supposed, to hold C liable for the difference? Or, if on a final settlement A proves a debtor, can C be made liable because he has received a portion of the assets, which, upon taking all the accounts together, should have remained for B? Or, if A, having an unliquidated claim upon B, and being indebted to C, directs B to adjust the unliquidated claim with C, and pay to him what is ascertained to be due, and he does so, can he afterwards make any claim upon C on the ground that he paid him more than was actually due to B? It is denied that in any of these cases the interest of C, if he be himself innocent, can be injuriously affected either by subsequent facts occurring between A and B, or by B's subsequent discovery that upon the facts existing at the time of the payment he paid more than A was entitled to.

Even if one person receives money as the agent of another, upon a consideration or in a transaction the subsequent failure of which divests the princi-

pal of his right to the money; or if it be paid to the agent under the mistaken idea that the principal is entitled to it, when he is not, it cannot be reclaimed from the agent by suit, after he has innocently, that is, without notice, paid it over to his principal, or has by his directions so disposed of it that it is not under his own control, unless where he is the agent of both parties, bound to notice and guard the rights of both. If the money be innocently received, and paid over innocently, before notice of any dispute or adverse claim, the agent is no longer responsible for it to the party from whom he received it; and he does not become again responsible for it to that party by receiving from other sources, or by having in his hands other money belonging to the same principal. He cannot be directly or separately sued by the creditor of his principal, merely because he is the agent, or has the money of his principal in his hands. To subject him to such a suit it must be the money of the plaintiff that is actually or virtually in his hands, or it must have been put out of his hands in bad faith.

If then the commissioners of the sinking fund were, as a corporation, an ordinary agent, which, acting for the state, had received in the name and right of the state, money to which the state, as subsequently ascertained, was not entitled; and if such an agent, for such a principal, can be sued and made liable at all for money thus received, it can, upon the principle above stated, be made thus liable only while the money is, or ought to be, remaining in its hands, and before it has been paid over to the principal, or so disposed of, according to the directions of the principal, as to be completely subject to its will, and no longer within the power of the agent.

The consideration of this proposition is, however, merged in the more important one growing out of the real character and objects of the sinking fund, and of the commissioners to whose charge it is committed, which will now be presented.

In February, 1836, the legislature of Kentucky created and established a sinking fund, to consist of certain designated funds, incomes, and revenues of the state, appropriated to the sinking fund, for the devotion of which to the payment of the interest on money borrowed for internal improvements, and to the final redemption of the loans, the faith of the state was pledged. (*Session acts* 1835-6, *page* 415.) By the same act the governor of the state and the presidents of three banks then existing were made the commissioners of the sinking fund, invested with the control and management, and charged with the application of its resources to its appropriate purposes. Since this first enactment the constitution of this body of commissioners has, from time to time, been slightly varied. It now consists of the governor and the presidents of the Bank of Kentucky and of the Northern Bank of Kentucky—the auditor being *ex officio* secretary of the board. The resources of the sinking fund have been greatly enlarged since its original establishment; and while its general objects of paying regularly the interest, and extinguishing gradually the principal of the state debts, has remained substantially unchanged, its efficiency has been greatly increased, and its operations have become more regular and more widely extended. By an act of 1840 the commissioners of the sinking fund were authorized to sue and be sued, *as other corporations.* By an act of 1846 they were formally incorporated, and they stand now as a corporation, invested with the usual corporate powers. The various legislative acts by which its resources have been built up, its duties prescribed, and its operations directed, need not be particularized. As a corporation it is not only the mere creature of the laws which have created and made it what it is, but it is the mere instrument of the state, created for its purposes, subject to its will, and wholly under its control. As a fiscal agent it is invested, in subordination to the legislative will, with the control of certain por-

tions of the revenues of the state, to be used in certain modes, and for certain purposes designated by the legislative power of the state. It is intrusted with considerable discretion in the performance of its duties. But it has no interest or object as a corporation outside of its connection with the fiscal affairs of the state; and it is more exclusively and purely a public agent than any individual officer can be. It may hold in its own name property of a certain description, such as bank stocks, but it holds such property by special permission, and for designated purposes, and it is in fact the property of the state. So the money which it may control is not in its own coffers, subject to its own will, but is in the treasury or in banks, like other money of the state, except that it is there to the credit of the sinking fund, subject to be drawn for the objects to which that fund is appropriated, upon orders, the form and authentication of which are prescribed by law. And a compliance with duty in all these particulars is secured, not only by reports from the commissioners, in which their transactions and the condition of the fund are exhibited, but also by the necessary publicity of the affairs with which they are concerned, and by the required co-operation of various distinct officers, between whom there is no connection or union, except in the occasional duties pertaining to this agency.

The commissioners of the sinking fund, as a corporation, constitute a most important branch of the fiscal department of the government, to which is committed the charge of paying the interest and principal of the public debt, and of managing, with a view to that object, a certain portion of the revenues and resources of the state; it is, in fact, a part of the government, as much as the treasurer and auditor are a part of the government, and it represents and is identified with the state, as to all matters coming within its sphere, as fully as either or both of those officers do. In truth, this corpora-

tion has no capacity or function or existence but in connection with its duties as fiscal agent of the state. It might, no doubt, like the auditor or treasurer, be subjected to the compulsory process of mandamus, to coerce the performance of a specific duty, in which others are interested; and being authorized, to a very limited extent, to deal in bills of exchange, for the convenience of making distant payments, it may, in transferring them, incur liabilities, which will subject it to an ordinary suit; and as the bill transferred by them will have gone to the objects of the sinking fund they may have the right to meet the liability out of that fund; but even in that case a judgment against them as a corporation to be satisfied, as it must be if at all, out of the sinking fund, would in effect be a judgment against the state. And if their liability to such a judgment be admitted, it is not on the ground of their capacity to sue and be sued, which must be limited to proper occasions of suit, but on the implication arising from the express authority to deal in bills of exchange, by which liability may be incurred. But no such implication arises from the authority to settle with the keeper of the penitentiary, and receive annually the commonwealth's half of the profits. No liability is incident to such a transaction. The provision of the act was nothing more than the appropriation of this share of the profits as a part of the sinking fund, whereby it went into the treasury to the credit of that fund, and subject to all the regulations and restrictions provided for that fund. The commonwealth's share of these profits became thus one of the regular and ordinary resources of the sinking fund, and the sums received from that source could be drawn out only in the manner prescribed for drawing that fund, and to be appropriated only to the purposes to which that fund was devoted, unless a different direction should be given to any portion of them by statute. These sums, therefore, were, as to all the grounds or objects of a suit against the

Com'rs Sinking
Fund.
vs.
Theobald.

commissioners for their recovery, completely out of their hands and control, and even before being paid to a creditor of the state they were placed under an inviolable trust for that purpose, so that the payment to the commissioners, as a part of the sinking fund, was in effect setting it apart for the creditors for whom the commissioners were the trustees. Indeed, in the regular operations of the commissioners, as prescribed by law, and required by the objects for which the fund was created, the sums received in each year were most probably actually drawn out and expended within a year; and there is no allegation nor any probability that any part of it remained unexpended even when a final balance was claimed against the state, and much less when this suit was brought, which, so far as appears, gave the first intimation of an intention to reclaim from the commissioners of the sinking fund any part of the sums which had been paid to them.

The commissioners deny that they have any money subject to the plaintiff's claim, and the denial is sustained by the requisitions of the law, and by the presumptions of fact, and it is unopposed by either allegation or proof. Under this view it is insisted that no cause of action is shown in the petition, and that certainly none is made out in proof. If the commissioners be regarded as a distinct independent party, no ground is shown for making them liable for the alledged balance against the state.

But it is further and most earnestly insisted that a suit brought against the commissioners for money regularly received into the treasury as a part of the sinking fund, is in effect nothing more nor less than a suit against the state, to recover money out of the treasury; that it is obvious, from all that appears in the case, as well as from what has been said in this brief, that the real demand of the plaintiff, whether just or unjust, is against the state alone. And as there is no colorable claim against the commissioners, but on the ground of their connection with and rela-

tion to the state, it is confidently urged that in this, as in other cases of demands against the state, the courts can afford no redress without express legal provision ; and that the plaintiff should be left like other claimants against the state, to seek satisfaction from the legislature.

It is hoped, therefore, that the judgment will be reversed, and the cause remanded with directions to dismiss the petition.

*G. W. Craddock* for appellee—

It is not deemed necessary to state in detail the provisions of the various acts of the legislature, in regard to the resources of the sinking fund, or the object of its creation. The primary purpose no doubt was, to create a fund sufficient to pay the interest upon the state debt, and finally to extinguish the debt itself. To effect this object it was esteemed necessary to place it under the control of persons clothed with ample authority and discretion to manage and conduct it. These individuals having been appointed, were, by an act of February, 1846, incorporated and given perpetual existence, with power to sue and be sued, contract and be contracted with, plead and be impleaded, answer and be answered, defend and be defended, in all courts and places, as *natural persons ;* to have and use a common seal, and to make by-laws, &c.

Previously to the passage of this act, the legislature, on the 7th January, 1840, passed an act creating the commissioners of the sinking fund a corporation. It is in these words :

" Sec. 1. That the commissioners of the sinking fund of the commonwealth of Kentucky, as such, and by that name and style, shall have power to sue and be sued, as other corporations."

The act of 1838, under which Theobald was elected, provided that the annual profits of the commonwealth of Kentucky should be appropriated to the sinking fund, and made it the duty of the keeper to

report, semi-annually, on the first Mondays of June and December, to the commissioners of the sinking fund, and to pay over the proportion of profits due to the commonwealth. These funds, so received by the commissioners, were to be held and disposed of as the law directed. It was made expressly the duty of the keeper to settle with and pay to the commissioners.

The resources of the sinking fund are, by a constitutional provision, placed beyond the reach of the legislature, and whilst they are dedicated to a special purpose, their control and direction belong alone to the commissioners of the sinking fund. It is made their duty to receive and pay out, and their dominion over the fund is as absolute as that of any other corporation over its corporate property. It was in view of the important and complicated duties devolved upon the commissioners of the sinking fund, that the legislature deemed it necessary to clothe them with ample corporate powers.

There is nothing in the act of incorporation indicating an intention upon the part of the legislature that the commissioners should not be liable to suit. The language is, that they shall have power to sue and be sued. There is nothing in the character of the duties required of them by law, nor in the powers conferred, to preclude the idea of their liability to be sued. On the contrary, the various settlements which they are required from year to year to make, and the various transactions of business which they are necessarily compelled to have with the numerous debtors of the sinking fund, and the creditors of the state, suggest at once the necessity of the power to sue and be sued.

But it is contended by the appellants, that they are the mere agents of the state, and have no interest in the corporate effects, and to sue them is in effect to sue the state. This I consider the most formidable position in the defense.

In the case of the *Bank of the Commonwealth of*
*Kentucky vs. Wister and others*, 3 *Peters*, 431, the
question was raised whether a suit could be main-
tained against the bank, on the ground that it was
substantially a suit against the state.

Mr. Justice Johnson, in delivering the opinion of
the court, says, " that the question is no longer an
open one; that the case of the *United States Bank vs.
the Planters Bank of Georgia*, 9 *Wheat.*, 904, is a
much stronger case for the defendant than the pre-
sent; for there the state of Georgia was not only a
proprietor, but a corporator. Here the state is not
a corporator, since by the terms of the act the presi-
dent and directors alone constitute the body corpo-
rate—the metaphysical person liable to suit."

The same question again arose in the supreme
court of the United States, in the case of *Briscoe vs.
the Bank of the Commonwealth of Kentucky*, 11 *Peters*,
311, and was decided in the same way.

The court further says, " that a state, when it be-
comes a stockholder in a bank, imparts none of its
attributes of sovereignty to the institution, and that
this is equally the case whether it owns the whole or
a part of the stock of the bank."

There cannot, I think, be found any difference in
principle between the cases cited above and the one
under consideration.

It is denied by appellee that the corporation can
screen itself from suit, on the ground that it is mere-
ly a fiscal agent of the state, and as the state cannot
be sued, therefore the corporation cannot be sued.
If the commissioners of the sinking fund may not be
sued, the language of the act of incorporation was
very injudiciously chosen, for it expressly provides
that they *may sue and be sued*, as other corporations.
It would be a strange corporation, possessing power
to contract and power to sue, and not be liable to
suit.

In this case an artificial being is brought into exis-
tence by an act of incorporation, styled the commis-

sioners of the sinking fund. Certain powers are conferred, among which is the power to sue and be sued. This attribute does not depend upon the interest of the corporators, but in this case is, by express enactment, conferred upon certain persons or characters, and their successors, who had not at the time of their appointment, and never can have, any personal interest in the fund placed under their control. The duties imposed are not only extensive but important. It is made their duty to look to the state debt and its extinguishment; to settle and receive the funds due the state from banks, turnpike companies, &c. In the receipts from all these sources they may receive more than they ought to receive, and it would be strange if they were not bound to refund such excess.

If the commissioners of the sinking fund have received more than the state's share of the profits of the penitentiary, whether through mistake, by miscalculation, or in any other way, may it not be reclaimed? The corporation, though an artificial person, has no power to do a wrong and shield itself under its agency. See *Tracy & Ballister vs. Swartwout*, 10 *Pet.*. 94, in which a collector of customs was held responsible for detaining goods on a claim for larger duties than he had a right to demand, though acting under the instructions of the secretary of the treasury. The court say the government is bound to indemnify the officer.

Whenever a corporation aggregate is acting within the limits of the purposes of its institution, all parol contracts made by its authorized agents, are express promises of the corporation; and all duties imposed upon them by law, and all benefits conferred at their request, raise implied promises, to enforce which an action lies. (*Bank of Columbia vs. Patterson's admr.*, 7 *Cranch*, 299.)

The principle involved in the case is not changed by the fact that the funds are deposited in the treasury of the state, and drawn upon the warrant of the

auditor. The commissioners can command this warrant at their discretion. The detail of the mode of operation is only for safety and convenience.

If a ministerial officer collect from me money, to which he is not entitled, I can recover it back from him. The commissioners of the sinking fund are in no better condition than a natural person would be under like facts.

Applying the law governing the acts of agent and principal, the commissioners of the sinking fund are responsible in their corporate capacity; first, because they have been guilty of an illegal act in refusing to settle with Theobald; and, secondly, in retaining from him money to which they have no right. The authority given was to receive the state's share of the profits—they have received more. If they, innocently through mistake, or fraudulently by design, received more than was due to the state as mere agents, they are liable to an action. As agents they ought not to have parted with the money until the settlement was completed. They were advised of the pendency of the suits for settlement, and they knew that Theobald claimed a balance against them; and if they parted with the fund which was due to Theobald, they should refund notwithstanding. It was never the right and property of the sinking fund, and the decree is right.

The suit in favor of the *Commonwealth vs. Theobald*, in the general court, was brought pursuant to the provisions of a special act passed for the purpose. The jurisdiction of the court was limited, and both the parties to the suit, and its object, were specifically pointed out in the act. The commissioners of the sinking fund could not have been made parties to that suit. The court had no jurisdiction of a suit between Theobald and the commissioners of the sinking fund.

Com'rs Sinking
Fund
vs.
Theobald.

December 2.

Judge Duvall delivered the opinion of the court:

This action was brought by the appellee to recover from the appellants $1,635 89, which sum he alledges was paid them, over and beyond what they were entitled to receive, upon a final adjustment of his account as keeper of the Kentucky penitentiary. He alledges that he was elected keeper for a term of five years, commencing the 1st of March, 1839, and ending 1st March, 1844; that by the act of 1839, under which he was elected, he was to receive, as compensation for his services, &c., one-half the net profits of the institution, the other half to be paid over by him to the commissioners of the sinking fund, with whom he was to make annual settlements and payments, which annual settlements and payments were regularly made, based upon full and fair statements of the accounts, furnished by him, but that a final settlement could only be made at the close of the term, at which period an inventory was to be taken of all the manufactured articles, raw material, &c., then on hand; that the appellants, refusing to make such final settlement, the attorney general was afterwards directed, by an act of the legislature, to institute suit in the name of the commonwealth against the appellee and his sureties, in the general court, for a settlement of his accounts as keeper, the result of which was, a decree to the effect that the appellee had paid to appellants the sum of $1,635 89, and that they owed him that sum, which he now claims with interest from the rendition of the decree; that the appellees appealed from said decree to this court, by whom it was affirmed; but that the act under which the suit was brought made no provision by which he could coerce the amount found due, either against the commonwealth or the appellees. The record of that suit, as also the opinion and mandate of this court, are referred to as part of the petition.

The demurrer of the appellees having been overruled, they answered, denying their liability for the

amount claimed. They alledge that they are the mere fiscal agents of the commonwealth, and that their duties and responsibilities are defined by law; they deny that there is any judgment or decree against them, or against the commonwealth, in favor of the appellee, for any sum whatever; or that they have received from him any amount over and above what he was bound to pay; or that they have in their hands, or under their control, any money subject to his demand; they deny that they were parties, or privies, to the proceedings in the general court, or that they are in any manner bound thereby; they say that they, nor the commonwealth, are indebted to him; that they have no knowledge as to what amount of the net profits there was from time to time paid into the treasury, nor can they say what amount of raw materials may have been delivered over by him, or the value thereof, and therefore require proof, &c.

The law and facts being submitted to the court, judgment was rendered against the appellants for the amount claimed in the petition, to reverse which they have appealed to this court.

It appears from the pleadings and proof in the case that, by the act of 1839, under which the appellee was elected keeper of the Kentucky penitentiary, he and the commonwealth were to be entitled each to one-half the profits. The keeper was to settle with the commissioners of the sinking fund on first December in each year during his term, and to pay over to them the state's share of the profits, provided such profits could be made out of the cash on hand, bills of exchange or notes; or if that was impracticable, the commissioners were authorized to receive such of the manufactured articles as could probably be converted into cash; but were not permitted to take any portion of the raw materials or stock on hand for that purpose. At the close of the term, a final settlement was to take place between the keeper and the commonwealth. By an act, of March 8, 1843, it

is provided, "that for the purpose of making this settlement, the raw material, stock and manufactured articles on hand, shall be valued by two disinterested persons, to be selected by the commissioners of the sinking fund, at the expiration of the keeper's term, (1st March, 1844;) said valuers to take an oath faithfully and impartially to value said property at a fair wholesale cash value, and annex the value to each article thereof, and return the same to the commissioners of the sinking fund," &c.

The act, also, provides for an inventory and valuation of the tools and implements of trade in the penitentiary, &c, and directs the commissioners of the sinking fund to settle with the present keeper, and to divide the raw materials, stock, manufactured articles, debts and effects belonging to the penitentiary, in which the keeper and the commonwealth are jointly interested, in such manner as to provide for the payment of the debts, and the return of the $25,000, with interest, which was advanced to the keeper when he was last appointed, and to divide the profits equally between him and the commonwealth, according to the law under which he was elected. Pursuant to this act, the commissioners of the sinking fund afterwards appointed Apperson and Bullock, who made the inventory and valuation, which was returned to the commissioners, together with a report showing that, according to the directions of the act, the property was so disposed of as to pay the $25,000 to the commonwealth, and to set apart for her use half the residue, and that in other respects they had pursued the directions of the act. It appears from the testimony of Mr. Harlan, that the commissioners of the sinking fund afterwards "gave notice to Theobald that they were ready to settle with him; and Theobald appeared before them to make the settlement, but owing to the complaints which Craig was making against the fairness of the valuation of Apperson and Bullock, the commissioners declined to go into the settlement;" that "Theo-

bald repeatedly urged the commissioners to make the settlement, but the commissioners declined doing so."

Thus the matter stood, until the legislature passed an act directing the attorney general to institute suits against the keeper, in the general court, for a final adjustment of the accounts between him and the commonwealth; pursuant to which, two bills in chancery were afterwards filed by the attorney general against the keeper and his sureties, impeaching the valuation as too high, and as unfairly obtained, and asking for a settlement, &c. The result of this litigation was a decree, by which it was decided, in substance, that a division of the joint property had been made between the commonwealth and Theobald, and possession taken thereof by the parties, and the division acquiesced in by both; that the valuation subsequently made by Craig & Henry, (successors of Theobald,) which was greatly below that previously made by Apperson and Bullock, should not be made the basis of the action of the court, for reasons stated in the decree; that the evidence failed to establish the alledged fraud or palpable mistake in the valuation; that by the commissioners' report it appears that the *commonwealth* has received the sum of $1,635 89½ more than her share of the profits of the penitentiary, and that the share of Theobald is deficient a like amount; and the bills were, therefore, dismissed. The decree was afterwards affirmed by this court, and is made the foundation of the claim set up in this action against the commissioners of the sinking fund, and the only question presented for our consideration is whether, upon the facts stated, and the law applicable to them, they are liable for the sum claimed, or any part of it.

The sinking fund was created by an act of the legislature passed in 1836. It was made to consist of certain specified revenues of the state, to be appropriated to the payment of interest on money borrowed for internal improvements, and the final redemp-

*(margin note:)* Com'rs Sinking Fund vs. Theobald.

*(margin note:)* 1. As a corporation the commissioners of the sinking fund have only a limited power and prescribed duties imposed on

them by the legislature. The money placed under its control is the money of the commonwealth. It is the mere instrument or agent of the government, to take charge of certain specified revenues of the state, and disburse them, as provided by law, in discharge of the public debt.

tion of the loans. The governor, and the presidents of the various banks, were, by the act, constituted "commissioners of the sinking fund," who were to control, manage, and appropriate its resources to the purposes designated. (*Session Acts*, 1835–6, *p.* 415.) By various subsequent acts of the legislature, not necessary to enumerate, its organization has been changed, its resources from time to time enlarged, and its efficiency and operations greatly increased and extended. By an act of 1840, the commissioners of the sinking fund were authorized to "sue and be sued as other corporations," and by the act of 1846, they were regularly incorporated, and the usual corporate powers conferred upon them. As a corporation, it is the mere instrument and financial agent of the state, its powers limited and its duties prescribed by the legislative power which created it. All money or property of which it has the control or management, is the money and property of the state. In its own right it can own nothing, and can have no function, or capacity, or interest as a corporation, except through its connection with the state. It may be said to be a mere agency of the government, whose important duty it is to take charge of certain revenues belonging to the government, and to apply them to the discharge of the principal and interest of the public debt.

2. The commissioners of the sinking fund may be sued when a proper case is made out.

It is undoubtedly true, as argued by the appellee, that the commissioners of the sinking fund "may sue and be sued, as other corporations," and that they may, in the discharge of the various duties devolving upon them, commit frauds or *other* wrongful acts which might render them legally responsible, by appropriate proceedings, to the party aggrieved. We need not undertake to specify the cases in which such liability might arise, or how it might be enforced, but will confine ourselves to the inquiry whether it has been made out by the facts of this case.

It has been shown that this corporation is the mere agent of the government, having the control and dis-

bursement of certain revenues belonging to the state, but having no corporate interests or powers except those growing out of its relations to the financial department of the government. Among the revenues thus subjected by law to the control of this mere agency, are the profits of the penitentiary, or such portions of them as by law belong to the state. These profits go into the treasury of the state, to the credit of the sinking fund, to be appropriated only to the purposes to which that fund is dedicated by law—the payment of the interest and principal of the public debt. The commissioners of the sinking fund have no other power over it, and can dispose of it in no other mode and for no other purpose. As soon as they received this money it became a part of the fund set apart by law for certain creditors of the state, for whom the commissioners became trustees. And in view of the objects to which this fund is devoted, and the duties of the commissioners with regard to it, as prescribed by law, it may be presumed that the sums received in each year were drawn out and appropriated within the year, so that it is not probable, nor is it alledged, that any part of the fund received from this source remained unexpended, even when the balance now sued for was claimed against the state, much less when this suit was brought The transactions out of which the appellee's demand arose occurred in 1844, and from then until the institution of this suit, in 1854, a period of about ten years, no intention was manifested or even intimated, to hold the commissioners of the sinking fund liable for any part of it; on the contrary the facts justify the presumption that the appellee was seeking redress elsewhere.

Upon what principle then, of the law applicable to the relation of principal and agent, can the right of reclamation againt the commissioners of the sinking fund, as relied upon here, be maintained? Even regarding them as an independent corporation, having no connection with the state except as agent in this

---

COM'RS SINKING FUND *vs.* THEOBALD.

3 By law the profits of the penitentiary go into the treasury of the state, to the credit of the sinking fund to be appropriated to the extinguishment of the state debt; and the commissioners of the sinking fund can dispose of it in no other way, and to no other purpose; and the presumption is that the fund was annually so disbursed; and upon that presumption there was no part of the fund claimed in the hands of the commissioners in 1854, when this suit was instituted, and there was no foundation for any decree against them.

4. An agent receiving a fund and paying it over to his principal, is not liable to the person who may seek to reclaim it; the resort must be to the principal.

particular transaction, if they had received in the name, and for the use of the state, as its mere agent, money to which the latter was not entitled, as subsequently ascertained, and had in good faith paid it over to the principal, such agent would be no longer responsible to the party from whom the money was received. If in such case the right of reclamation existed at all as against the agent, it could exist no longer than while the fund remained in its hands, and before it had been paid over or so disposed of as to be completely beyond the control or power of the agent. In all such cases the party must look to the principal, not to the agent. And it is obvious, from the view we have taken, that a recovery in this case would be, in effect, a recovery against the state, of money which had been regularly received into the treasury, through an agency constituted by law for that purpose, and long since appropriated to the objects to which it is by law devoted. If the appellee has a just right of reclamation it is against the state, she having received and had the benefit of the fund, and not against the appellants. And such was no doubt the view of the claimant himself up to the time of the institution of this action. In the suits by the commonwealth against the appellee, above referred to, the appellants were not made parties, and why they were not it is difficult to conjecture, if the appellee then held or supposed them liable. And it is worthy of remark, that in the decree of the general court, as well as in the opinion of this court affirming it, the claim of the appellee is treated and spoken of throughout as a claim against the *commonwealth*, for the reclamation of money claimed to have been overpaid to the *commonwealth*, in the division of the profits of the penitentiary between the *commonwealth* and keeper. In none of those proceedings, so far as the record shows, is there to be found any reference by either of the courts or by the parties to any supposed liability on the part of the appellants; and it is clear that by the appropriate pleading, in

the suits referred to, the relief now sought might have been as fully and effectually obtained as by this action.

Wherefore, the judgment is reversed, and the cause remanded, with directions to dismiss the plaintiff's petition.